May it please the Court, Counsel. My name is E. Brent Bryson. I represent the appellants. I would like to use 12 minutes for my argument in chief and reserve 3 minutes, please, for purposes of rebuttal. As this Court is aware, a grant of summary judgment is reviewed by this Court de novo. The lower court, in granting summary judgment, made credibility determinations, weighed the evidence, and construed all conflicting evidence in favor of the moving party. In essence, it conducted a bench trial, which is inappropriate for purposes of summary judgment. There's a quote that's found in the case of Fruns v. City of Tacoma, 468F3-1114, here in the Ninth Circuit, that's really on point in this case. And the quote is this, As the officers doubtless knew, physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed. It is uncontradicted at the time Dunn made illegal entry into the home that the boys, age 16, two of them 16 and one 18, were lawfully inside their residence at the time Sergeant Roberts encountered the individuals. The boys thus enjoyed the highest level and expectation of privacy that society and the courts have recognized as reasonable time and time again. It is the government's burden to overcome the presumption of unreasonableness that attaches to all warrantless home entries, U.S. v. Davis, 290F3-1239. It's also important to remember that at the time that the officers were dispatched to the scene, this was not an exigent circumstances type call. This wasn't a murder. This wasn't a felony. This was a misdemeanor suspected prowler call, EOR-713. The general factors that were known by Sergeant Roberts and Officer Dunn at the time they encountered the boys inside the residence were that there was a report of two white males, first of all. That's what the PR, the person reporting, commonly referred to as a PR, stated. That had gone over a wall. One had a skateboard. One came back and left in a maroon SUV. That there had been history of burglaries in the neighborhood. There was an open side gate, an open shed door, and a slightly open sliding glass door. Sergeant Roberts testified in his deposition that he did not see any of the generalized evidence of a point of entry associated with a burglary, such as broken glass, pry markings, bent rails, EOR-433. What Sergeant Roberts did see when he observed the three Hispanic kids, aged 16 through 18, the boys, was that they were in a bedroom playing music, video games, in essence hanging out with a dog. And what is extremely as important is that the bedroom door was closed. These kids and the dog were in a contained area, as Sergeant Roberts observed them, and then places a gun through the window and says, don't move or I'll shoot you, and then begins to order inconsistent commands towards the youths, that they do the best that they can do to comply with. And Sergeant Roberts even admits that at the time he encountered the youths, the youths were inside the home where they have the greatest expectation of privacy under the Constitution, EOR-192. Sergeant Roberts also says that based upon those generalized factors that I just articulated for you, that it could be a possibility that there's nothing going on. Your Honors, what happened here is that basic informational questions could have alleviated this whole situation. There would not have been a complaint filed. I would not be here before you today. Sergeant Roberts asked no typical questions that law enforcement 101 teaches to ask. He didn't direct any of the youths as he's got them at gunpoint, very simply in a contained area. You two don't move. You, sir, turn the music down. What are you doing here? Didn't bother to ask that question. Do you live here? Didn't bother to ask that question. Why are you home at a little bit before 2 in the afternoon? Where are your parents? What school do you go to? And both Officer Dunn as well as Sergeant Roberts admitted, if those basic types of informational questions had been asked, that they would not have entered the residence. Basic questions could have alleviated this. How do they enter the residence? If the window is open and the gun is pointed through an open window, is that how it works? Well, that's how it works from a factual standpoint as far as Sergeant Roberts. While Sergeant Roberts, let's assume, I'm just going to stand here for a second. Let's assume this is the open window. I'm Sergeant Roberts. I'm pointing a gun inside at the youths. Now let's take a few steps over this way. The distance, I think, was less than 10 feet. You have Officer Dunn that is at the sliding glass door. Of the same room. Of the room. Different room. Okay, that was my question. Different room. Now, Sergeant Dunn, who is a new officer less than a year out on his own after completing FTO training, makes the decision based solely on Sergeant Roberts having to give multiple commands and the tone of his voice changing. So based upon multiple commands, the tone of Sergeant Roberts' voice changing, Officer Dunn says, I'm going inside because you can't contain these youths. You can't contain the situation. Yet Officer Dunn admits he never saw the youths. He never saw what was going on. So solely on repeated commands, a change of tone and voice, Officer Dunn makes an illegal entry into the residence, which escalates and exacerbates the whole situation. That is the key to the rest of the conduct. It goes downhill from there. Because what happens once Officer Dunn has made his illegal entry, he doesn't have permission. He has no type of warrant. There are no exigent circumstances. The lower judge tried to rely upon the case of Ryburn to somehow state that there was officer safety concern. Both officers admit that they were they never felt threatened. Sergeant Roberts specifically stated at no time did the Hispanic youths pose a threat to him. So does the second officer then go through an adjoining room into the room where the boys are behind the closed door, and then the dog runs out? Is that how the dog shooting occurs? Not quite. Let me see if I can articulate it. The boys are in a closed bedroom door. The window's open. Sergeant Roberts has a gun on them, is giving them conflicting commands, but doesn't ask any informational questions. Sergeant Roberts then says, go to the front door and open up to let officers in. Okay? That's the directions from Sergeant Roberts. Meanwhile, while Sergeant Roberts is issuing those commands, Officer Dunn, based solely upon the commands being repeated by Sergeant Roberts and the change in Sergeant Roberts' tonality, opens up the sliding glass door and goes in into a living room area, a separate area, and begins issuing commands to the kids. So at this particular time they're still inside the bedroom. Okay. So at this point we now have Sergeant Roberts that's issuing commands to the kids. We have conflicting commands that are being given by Officer Dunn, who's now inside the house illegally, which could create confusion. Despite all the confusion, the kids understand that they're going to come outside. Now, while Sergeant Roberts is issuing these commands, Henry, who's also referred to sometimes as Brian, asks and says, can I put my dog away? And Sergeant Roberts replies, no, you cannot put your dog away. Sergeant Roberts disputes ever seeing the dog, which is a material issue of fact. But Henry, if you accept, which you must for purposes of summary judgment, our version of the facts, the boys all say, Henry wants to put the dog away. He's not allowed to do that. Roberts says go out and open the door. They open the door. As they walk through the hall towards the living room area where Officer Dunn is, the dog comes out and gets ahead of the boys. So you have the three boys that are coming into the living room area. The dog comes up. And now there's another material issue of disputed fact regarding what happens with the dog. Officer Dunn says the dog lunges at him. That's why I had to shoot him. And the boys say that's not true. The dog came up and was close to us and barked. So at that point, Officer Dunn shoots the dog, the family dog, Hazel. And then Sergeant Roberts now comes inside to the living room area. He sees the kids down on the ground being compliant, following Officer Dunn's directions. At this point, other officers have come into the house. Now the kids are being handcuffed, even though they're being compliant. In the living room. In the living room. Okay. And what's really important is even at this point, even at this point, no informational questions are being asked of these kids. So when the father shows up, are the boys out in the front yard? At the time the father shows up, yes, the boys have been taken out of the house and placed outside. Okay. So your argument regarding the State law claim of the separation of, you know, the father from his children, are they being held across the yard from each other? Is that what your argument is on that? Well, it's not just the State law claim. It's the 1983 14th Amendment familial interference with the parents' rights. And what are the facts of that? You're just asking the factual basis. Yeah, the factual basis for it. Ah, the factual basis, and before I could just get to that, and I will, but what's important is Jordy and David, the two 16-year-olds, are cuffed inside, but Henry, also known as Brian, is not cuffed. He's allowed to go free to take care of the dog. So there can't be, it's a pretext, there can't be a real thought that these individuals are some type of threat, because otherwise all three of them would have been cuffed. Now to your question. Well, you argue at that moment that there was, it was determined there was no crime admitted, committed. Right? At the moment that everyone is out in the front yard, it's your argument that the officers determined no crime had been committed. Absolutely. And the reason that I argue that is because the officers allow Henry to call his father and allow his father to come to inform them what's going on. Okay. Now, what are the facts of the separation? Right. My 12 minutes are up. So if there are other questions, otherwise I'd like to reserve some time. I want you to answer the question on the facts underlying the separation claim. Well, the facts of the underlying separation claim are when the father arrives, Mr. Sandoval, with his 12-year-old daughter. He arrives at the scene. He sees his son's two friends, David and Jordy, cuffed, sitting on the ground. He sees his son, Henry Bryan, covered in blood, holding the dog. At that point, he doesn't know whether his son's been shot or whether it's the dog. He gets out of the car after just having back surgery with a cane, takes two steps, is told to stop. He stops. He puts his hands up. He drops his cane, puts his hands up, but he is upset, as is understandable. So that's the separation. He was not allowed to go into and assist and see what's going on with his house, what's going on with his children. He was prevented, and because he was upset, he was handcuffed. All officers admitted that Mr. Sandoval had committed no crime at that point. He was upset. So he was handcuffed, his hands behind his back, was then placed inside the backseat of a patrol vehicle for 30 to 35 minutes. I think we know the facts from there pretty well. Yeah. Those were pretty clear. Thank you, counsel. Thank you. May it please the Court. My name is Craig Anderson on behalf of the appellees, the officers in the police department. The importance of this case is that what the plaintiffs are doing is Monday-morning quarterbacking. They're looking at the facts that we now know with 20-20 hindsight. What happens here is these police officers receive a 911 call from Albert Schoten, who says that he saw two youths jump a fence and appear to be casing a house. Doesn't he say 18 to 20 years old? 18 to 20, yeah, right? Yes. He gave a description of white males, 18 to 20 years old. White males. Correct. And so the officers show up. They interview Mr. Schoten. They obtain his information. Sergeant Robertson does a very good job. He makes sure he gets an officer post on the back, an officer post on the front. They don't immediately go kick in the door, and they don't enter the residence. Well, they couldn't. Absolutely they could not. And didn't they? Yeah. I mean, I didn't know I needed to make that, but yes. Geez. They were restrained. They were restrained very much at that point, Your Honor. So then he begins to look at the home. Now, what we have here, which is where I think the Ryburn v. Huff case comes into play, is there's a lot of little factors that in and of themselves would not justify probable cause or entering for reasonable suspicion. But what we do get is enough facts to put together to say that something's going on. Even Plaintiff Jesus Sandoval testified, there were no cars in my driveway. It looked vacant. It didn't look like anyone should be home. They then see the open gate. They see the open storm drain. So they begin to walk into the backyard to see what they can see. Now, he positions Officer Dunn down the house to guard an already opened screen door. It's partially opened, right? But now, just let me ask one thing. He didn't see that. Officer did not see them jump over into the curtilage at that moment? Oh, absolutely not. The officers never saw anyone jump the fence. Right. So, in fact, what Sergeant Roberts said was he thought the home had possibly already been ransacked, and they had left. And so they're not making – they're just looking at what they're – at the evidence here. So Officer Dunn is down by the screen door. He will never look into the room and see the persons. Sergeant Roberts continues to clear the house. Now, a little bit of a red herring here is he didn't see any pry marks or he didn't see any obvious forced entry. Well, there wouldn't be because everything was open. So the window was open. So a reasonable officer could conclude that they had went through the window. They don't have to pry open an open window. So he comes that open window, and he's startled by three youths in a room. They don't match the description. Right. Well, as he testified, you know, they were Hispanic and it was for white youths, but he testified that he gets incorrect evidence or, I mean, incorrect information all the time. And what are they doing in there? According to the boys, which you have to accept they're facts. It's true because there is a dispute here. One says he's playing a video game. One says he's listening to music. And that's what they, burglars usually do. They shut the bedroom door. They sit down. They play music, play a few. I mean, that's where it gets kind of preposterous. You've got guys shooting a gun through the window, and he's got three kids in a closed room. And so what he's going to do is investigate and find that out. I mean, a reasonable officer would. And how would a reasonable officer investigate? Like, hello, what's your name? What are you doing here? Well, I think the first. Does he do that? No, he does not. Because I think the first step of what a reasonable officer does is he controls the situation, is he gains control of it. And at this point, he's there to investigate a minor crime, correct? I would disagree, Your Honor. Okay. He's there to investigate a burglary at this point, because they are inside the home, which is a felony. And that's where we're going. Does he see any weapon? Does not. And does he have any fear for his safety at any time? I would say you're always in fear for your safety in this type of a situation because he. No, but what's the testimony is the opposite, isn't it? Well, the testimony of the officer was he was on heightened awareness, and he wants to see their hands, which they do. I think the question was safety. Safety. Safety. Well, there's always a safety concern. No, but I thought that there's testimony in there where he says he didn't fear for his safety. Well, he. I mean, don't back away from your own officer's testimony. No, I'm not backing away from it. I'm saying that he never perceived a threat, but that's because he was controlling the situation. Okay. And so he doesn't want them to put their hands anywhere or to hide them. And so, yeah, he never saw anything that caused him concern for his immediate safety. So he says, don't move, turn down the music. Yeah, show me your hands, don't move, and instructs Geordie to turn down the music. Turn down the music. Now, what happens is Officer Dunn is down the way, and these commands are issued very loudly because of the music. It is his perception that he's having trouble controlling the individuals, and that is why he determined to make entry. And because it's a felony, burglary is what they're investigating, is I – it's our position that this would move under the exigency exception. Okay. Part of the most recent case was Stanton v. Sims, and that case dealt with a misdemeanor. And what the case says, though, is with a felony, when it's a felony at issue, there is greater weight given to the officer's decisions. Okay? And so what Officer Dunn would have to – Who's in charge? Sergeant Roberts is in charge. Okay. But – And one person is supposed to give commands, right? Yes, and only Sergeant – now, and there's nothing in the record that there was conflicting commands. Sergeant Roberts is issuing the commands. Okay? Now I'm talking about verbal commands to the kids. Okay? Officer Dunn enters the home, and at that point, he takes over as the lead officer. Once he's inside the home, and he begins issuing commands at that time. I guess what I should have said is they were never issuing simultaneous commands. Right. Because if you look at 269, basically there's some discussion there about potential conflicting commands. Yeah. And so what would have been better for me to state was that there was only one officer issuing commands at a time. I think the real question comes down to this, is you have to construe everything in the light most favorable to the plaintiffs here. So your argument is really, well, here's their perception. The plaintiffs are telling a different story and construing everything in their favor. The question I have is why this isn't really a classic jury case. Okay. Thank you. I'm doing my best to construe everything in favor of the plaintiffs. I understand. Okay. But, you know, then we're sort of in this, you know, construing, and we have these facts and we have those facts. So the real bottom line is should this be disposed of on summary judgment in favor of your clients, or should it go to the jury? Okay. And absolutely it should have been summary judgment because the undisputed facts establish probable cause, okay, that something was going on. And so when he gets to the window, Sergeant Roberts, and he sees the use, it is entirely reasonable for him to want to investigate this further. And I understand what they're saying is he should have been, hey, who is everybody? How are we doing? Let's get our I.D. out. But what he was trying to do was control that situation. How is it uncontrolled, construing the lights, the facts and the light in the most favorable of the plaintiffs? They were in a contained room. Okay. They were compliant, again. Yes. Construing the facts in their favor. In their favor. But there were three of them. And this is where Officer Dunn's state of mind comes in because he can't see into the room. He does not know the door is closed. He does not know, you know, what they're doing. He just hears the urgency of Sergeant Roberts' voice. And his purpose was to go in to make sure they didn't scatter. I'll go back one step even earlier. How is it probable cause? Probable cause of a burglary? Right. Okay. Well, that would go back to the 911 call, the 911 person. To an open window seeing three Hispanic boys, right? Well, it's going to be a totality of the circumstances on this probable cause issue. Because I would agree with you that independent, these facts do not, if you take each one independent. And he didn't see them jump over and go into that room. The officers didn't. Right. So he gets on to the land. Is it the backyard, front yard? Backyard. Where is this window? Backyard. So now he's walked around the back of the house. He didn't follow them. So he's got the one individual giving him the tip that this is what I've observed them jumping over, but he's not jumping over with any materials like, you know, TVs or, you know, stealing anything.  So he goes around. I'm just saying no contraband. And so he goes around and observes the three boys in a closed room with the TV on. Okay. Not that simple. Because what they do is they show up and they talk to the person reporting. They identify the house. And then they begin to look at the house. And there's no cars, so it looks like it's vacant. He sees that the back gate is open. He sees that a shed is open. And then the garage door, security door, is open. So they start seeing all of these signs put together that, hey, someone's been in and out of this house. Reasonable suspicion? Where did you jump to probable cause? I'm still on reasonable suspicion. Okay. And so then when you get to the back room and you see three individuals in what appeared to be a vacant home. Three individuals who he says don't match the description. Well, Sergeant Roberts never said that. His testimony was that he often gets race or that persons reporting often get the race and the age of suspects. Okay. Fair enough. What does he say he observed that gives you probable cause? Where did you jump from reasonable? What did Sergeant Roberts say?  To get to probable cause. Okay. Well, obviously for somebody judging them, I shouldn't be using this. But he says the youths are moving rapidly around the room and acting suspiciously, which it is later found there is marijuana in the room that they are hiding. But that was Sergeant Roberts, and the plaintiffs claimed they were just sitting silently, doing nothing. So probable cause for what? Moving around the room, meaning? Probable cause for a burglary. There's been these reports. There's this evidence that someone may have entered the home. And then all of a sudden you have three individuals in that home with what appears to be that no one should be home. And even at that point, he's not arresting them. You know, he's detaining them, absolutely. Okay. Well, let's jump ahead. Okay. So let's assume that they're properly in the house. At the moment they come out, he shoots the dog, or the officer shoots the dog. Why isn't there a genuine issue of material fact of whether or not it's excessive force? Because he draws lethal, he draws his weapon, uses lethal force with them in a close proximity, could have injured them. Okay. Accepting their facts is true. Yeah. The two boys, Brian and Jordy, do not see the shooting of the dog. Okay. What they see is the dog. The dog was shot. There's no dispute about that. No, but I'm going to get to your question. Okay. So they see the dog go by them, which means the dog is advancing. Okay. So it's undisputed from the plaintiff's testimony the dog is advancing forward. Yeah. I mean, it's also undisputed that Henry says, may I take care of my dog? The officer says no. So the officer knows the dog is there. They open the door. The dog comes out, and the officer shoots. Okay. Based upon their testimony, it would be known to Sergeant Roberts. Well, I mean, the officer. Yeah, but there's no evidence that officer knew the dog was there. If I said in the spoke, I thought I just said officer, but go ahead. I'm sorry. What kind of dog is it? A pit bull. So the pit bull comes out and ends up, according to David, next to him and moving forward when the officer shoots the dog straight down, and the bullet ends up in the ground, which shows it was a downward shot indicating the dog was in close proximity to the officer. Now, the seminal case on that is the Hells Angels case with San Jose Hells Angels. And what the court said there was if a dog surprises an officer, if a dog is unknown to the officer, it can be reasonable to use that type of force. Right. But here the facts are that they announced the presence of the dog. I don't think there was ever any testimony. I know there wasn't, that they announced it to Sergeant Roberts, but Officer Dunn did not know that. So he was surprised by the dog. That's interesting. Okay. That he was caught off guard. He thinks he's going in to corral these three boys from running into other rooms and separating, and all of a sudden a pit bull, and it's undisputed, is coming at him. The pit bull is advancing and barking, according to, this is where it gets confusing, because Henry says the dog was barking. The other two say they never heard a bark. So barking, not barking, I don't know which they're going with on that. But the pit bull is advancing towards Officer Dunn, who shoots it. And so based upon the surprise, based upon the fact that he perceived he was in danger, there would be at least qualified immunity on that issue for Officer Dunn if he's in the home legally. In the hallway, the shooting of the dog took place. Is that right? The shooting of the dog took place within the home. Because when they come out of the bedroom, the dog shoots out, right? I mean, he runs out. Yeah. He moves into the sliding glass. Sheep. Sheep, yeah. Hazel. Hazel. Hazel. The pit bull, okay. But, you know, to get all through this, I mean, I'm just, there's so many facts that we have to be the arbiter of. It just, it strikes me. I just, it's very hard to see why this is a summary judgment case. And you both have made very good jury arguments, but we're not a jury. I think you can take the undisputed facts from the boys and still establish that, you know, I'm not sitting with 20-20 hindsight in, you know, the comfort of a courtroom, that this is a dynamic, critical situation where the officers were simply trying to make sure no force was used or nothing bad happened. I think, let's go back to Officer Dunn. And he basically says, well, the voice change, I mean, basically you get from no probable cause to probable cause solely by adding that last fact. Because he then has to go, he has to make a go or no-go decision. And to be clear with Your Honor, I'm not going to take an unreasonable position that there was ever probable cause here. I will strongly assert there was reasonable suspicion to detain. And that's what was going on here, was this attempt to detain. And under the exegesis of the ---- Officer Dunn? Officer Dunn, well, Sergeant Roberts would have had ---- Sergeant Roberts over here with the gun through the window. Now, the way they get in the house is Officer Dunn. Officer Dunn is the one that enters the home with the intention that he's going to prevent these individuals from spreading into the house to control them. And that he perceived that Sergeant Roberts could be in trouble based upon the tone of his voice. And the fact that we're dealing with a felony here is what takes us beyond the Sims v. Stanton case. You know, that this is, you know, the intention was to prevent violence. Now, obviously the dog was shot. But the decision was a split-second decision to go in and control the situation and then usher them outside, as they did. They didn't search the house. They didn't go through the house. They just ---- to control the people and get them out in the front yard. Okay? So they didn't ---- after they controlled the youth, they didn't take the ---- they didn't go search the house or take any other intrusions. Okay. Your time has expired. Any further questions from the panel? Real quick, just the 14th Amendment claim, I think you have to have a separation for the family. You know, it's usually in a shooting case or a death case, or if kids are taken to a foster home or something by government action where they're ---- That was my question. I mean, what is the separation? Is it across the yard and for a period of time? And is it a question of a continuum? Like, is it that this is the smallest amount of time and space that could be sufficient, and then ---- I didn't spend a lot of time on that issue, but I can tell you there's no cases that hold that separating someone across the yard is going to shock the ---- Well, I thought there ---- he limited to the yard, but the father was placed in a patrol car forcibly and for 30 minutes. Isn't that right? Around 30 minutes, but ---- Yeah. So that's the claim. And the issue then would be does that conduct shocks the conscience for a purpose unrelated to a legitimate law enforcement purpose and intended to separate the ---- to sever the family relationship, which I don't think you have anything close to that here, Your Honors. Okay. Thank you. I actually have some citations to the record, I think, that are going to answer the very questions you were talking about I can direct you to. The first one has to do with probable cause. This is the deposition of Michael Dunn. It's EOR 268. Question. Let me stop you there. Assuming what I'm telling you is true, that two teenagers are playing video games and one is listening to music with a dog on the bed, assuming that is true, what about that gives you probable cause that a burglary is being committed? Answer by Officer Dunn, that what you just told me, no, it's not. That is not probable cause. That is Officer Dunn at his deposition, EOR 268. As to a felony or misdemeanor, it is clear, EOR 713, the officers were dispatched to investigate a suspected prowler call, a misdemeanor, EOR 713. Let's go to the minorities. Roberts admits that Henry, Jordie, and David were all minorities that did not match the description of the alleged prowlers in race, age, or number. That's EOR 18586. As to the safety issue, Sergeant Roberts admits at EOR 465, the boys never threatened him verbally. He never saw a weapon and did not perceive the boys as a threat, only a concern. Again, EOR 465. As to the dynamic conduct, Sergeant Roberts admits at EOR 207, Sergeant Roberts saw no conduct by the boys that would make the situation dynamic. Just Hazel running around after being shot, there was no reason to handcuff the youths. Again, EOR 207. The dynamic situation was created by the shooting of the dog by Officer Dunn, not by the youths. Unless there are any questions, I would submit at this time. Thank you, counsel. Thank you. The case just heard will be submitted for decision and will be in recess. Thank you.
judges: Kendall, Thomas, McKeown